**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Little Italy Development LLC, | ) | **CASE NO. 1:11 CV 112** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| Chicago Title Insurance Co., et al., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendants. | ) | |

<u>**INTRODUCTION**</u>

This matter is before the Court upon Defendants Chicago Title Company's and Fidelity

National Title Group, Inc.'s Motion to Disqualify Thompson Hine as Counsel for Plaintiff (Doc.

39). This is an insurance dispute. For the reasons that follow, the motion is GRANTED.

<u>**FACTS**</u>

Only those facts necessary for a resolution of the instant motion are set forth herein.

Plaintiff, Little Italy Development LLC ("LID"), brings this lawsuit against defendants,

Chicago Title Insurance Company and Fidelity National Title Group, Inc. (collectively,

"Chicago Title"). LID purchased a title insurance policy from Chicago Title. On July 9, 2009,

1

Little Italy Preservation Partners sued LID regarding the use of an easement over LID's property ("Underlying Litigation").  Thompson Hine, LLP represented LID in the Underlying Litigation and represents LID in the matter currently pending before this Court. Thompson Hine also represented Chicago Title on a variety of matters.

A.      The Moore matter

In August of 2007, Thompson Hine agreed to represent Chicago Title in an action against, among others, Pamela Moore ("the Moore matter") alleging that Moore improperly diverted escrow funds for her personal use.  Shortly thereafter, an agreed judgment was entered in the amount of $365,837.95.  From approximately January 7, 2009 through November 20, 2009, Thompson Hine foreclosed on Moore's property in order to satisfy the judgment.  During the majority of this time period, Thompson Hine's client contact at Chicago Title was attorney Aaron Wegner.  The foreclosure sale resulted in a deficiency of $77,000.  On November 21, 2009, Chicago Title emailed Thompson Hine and indicated that "it may be that you will be able to close your active file upon completion of the payment proceeds."  On May 14, 2010, Thompson Hine conducted a debtor's examination of Moore, which showed that Moore had no significant assets.  On June 7, 2010, Chicago Title inquired as to whether Moore had been criminally indicted.  Thompson Hine contacted the prosecutor's office the following day.  The time charge for the telephone call to the prosecutor is the last time entry Thompson Hine made with respect to the Moore matter.  Over a year later, on July 1, 2011, Chicago Title sent an e-mail to Thompson Hine asking whether Thompson Hine had "heard anything from Pam Moore," and questioning whether an indictment was ever filed.

B. The Brown matter

2

Thompson Hine also represented Chicago Title in a similar matter filed on December 8, 2008 (the "Brown matter").  Chicago Title moved for summary judgment on November 3, 2009.  Thereafter, an agreed judgment of approximately $255,000 was entered against the defendants in the Brown matter.  On May 14, 2010, Thompson Hine conducted a debtor's examination and began garnishing Brown's wages.  The last time charges entered by Thompson Hine occurred on August 5 and August 30, 2010.  On August 30, 2010, Thompson Hine sent a letter to Chicago Title indicating, "at this point all we are doing is forwarding the proceeds from the wage garnishment.  Do you want us to close our file and direct the garnishments be sent directly to you?"  Chicago Title responded, "Please close it out."  Nearly a year later, on August 1, 2011, Chicago Title contacted Thompson Hine, indicating that it had "not received any funds since March," and inquired as to whether Thompson Hine could "look into" the matter.  Thompson Hine responded that it could no longer represent Chicago Title as it was representing LID, who is adverse to Chicago Title.

C. Thompson Hine's representation of LID

LID is a partnership owned in part by an entity controlled by Terence Coyne.  Thomas Coyne is the brother of Terence Coyne and is the head of the real estate department at Thompson Hine.   In 2006, Thompson Hine represented LID in connection with the acquisition of certain land in Cleveland.  Thompson Hine negotiated a title insurance policy with Chicago Title on behalf of LID.  According to Thomas Coyne, Thompson Hine regularly negotiated title insurance policies with Chicago Title on behalf of its clients.

Beginning in 2008, Thompson Hine represented LID in negotiations with a landowner adjacent to the property recently acquired by LID.  The negotiations involved certain easements

3

and other property related disputes.  On July 9, 2009, the adjacent landowner brought the Underlying Litigation against LID.

Immediately upon receipt of the complaint in the Underlying Litigation, LID asked Thompson Hine to seek coverage under the title insurance policy issued by Chicago Title. According to Thomas Coyne, he informed LID that Thompson Hine also represented Chicago Title and that "any potential conflict of interest" needed to be addressed prior to asserting a claim against Chicago Title.  Thompson Hine then informed Ed Horejs, Vice-President and Regional Counsel with Chicago Title, of the coverage claim and raised the conflict of interest issue.  Thomas Coyne avers that Horejs advised him "that Chicago Title, as a matter of practice, does not view the assertion of a claim for coverage as a conflict of interest."  According to Thomas Coyne's time charges, he then met with Horejs and extensively discussed issues regarding the coverage issues.  These discussions occurred from July 20, 2009 through July 23, 2009.  On July 23, 2009, Coyne sent a draft of a coverage demand letter to Horejs for his review. Horejs reviewed the letter and, based on his input, Thompson Hine finalized the letter on behalf of LID and delivered it to Chicago Title on July 24, 2009.

On August 24, 2009, attorney Aaron Wegner, on behalf of Chicago Title, responded indicating that it accepted the defense of only one claim in the Underlying Litigation.  It expressly rejected a defense of the remaining claims.  On September 8, 2009, Thompson Hine responded to Chicago Title's letter, stating its belief that the "complete defense rule" obligated Chicago Title to provide a defense of all claims asserted against LID.  The letter further indicated that Thompson Hine was willing to act as co-counsel to the firm representing LID on the claim that Chicago Title agreed to cover.  However, Thompson Hine indicated that it "would

4

look to Chicago Title for reimbursement of Thompson Hine's attorneys' fees for that work pursuant to our belief that Chicago Title is obligated to provide a complete defense."  On September 30, 2009, Thompson Hine sent an email to Chicago Title indicating that it had yet to receive a response to its September 8th letter.  The email indicated that "a prompt response is important to avoid prejudice to [LID] as it considers its settlement and litigation positions."  Chicago Title responded on October 9, 2009, confirming its initial position that it would accept the defense of only one claim.

On November 3, 2009, LID met with attorneys from Thompson Hine.  One attorney's time charges indicate that the meeting occurred in order to discuss the "case against Chicago Title."

On November 5, 2009, the Thompson Hine attorney responsible for Chicago Title matters sent at email to the Thompson Hine attorney in charge of the Moore and Brown matters. The email indicated that a firm client "will be filing a title claim against Chicago Title.  It has not risen to the point of litigation and we don't know if it will.  Where do we stand on the [Moore and Brown] matters?  Are they nearing completion?"  The attorney responded that the matters "are nearing completion but it will still be a couple of months."  In addition, Thompson Hine agreed to refrain from taking on "new work" on behalf of Chicago Title.

On December 15, 2009, Thompson Hine and LID amended their fee agreement.  The agreement provides as follows:

> B.    <u>Claims Against Chicago Title</u>
>
> Contingency of one-third of total settlement payment or award (damages/penalties/legal fees/other.)
>
> Separate and apart from above fee, client to pay, on a current basis, all out of pocket costs

5

and expenses, including court filing fees, court reporter fees, consultants, appraisers, experts, computer research, photocopying, etc.

In addition, the agreement capped LID's fees in the Underlying Litigation at $350,000 plus the "$37,000 previously paid."  According to Thompson Hine, it informed LID that it could only accommodate LID's alternative fee request if Chicago Title was no longer a client at the time of the "anticipated litigation."  Thompson Hine further indicated that a "formal claim" against Chicago Title "might not" be asserted for a period of one to three years following the close of the Underlying Litigation.

On June 17, 2010, internal Thompson Hine emails reflect the following exchange:

Q:      What is the status of our Chicago Title cases–still pending or now complete?

A:      We are still in collections.

Thompson Hine then forwarded the email to another attorney at the firm and indicated:

A:      Still have ongoing client matters for Chicago Title.  This may not prevent making a title claim on behalf of a client, but it would not be permissible to sue Chicago Title.

On July 15, 2010, after receiving correspondence from Thompson Hine regarding Chicago Title's lack of attention to the title claim, Chicago Title informed Thompson Hine that it was denying LID's request to reconsider the August 24, 2009 coverage determination.  On July 21, 2010, Chicago Title sent a letter to the attorney representing LID in the Underlying Litigation.  The letter discusses Chicago Title's settlement position.  In addition, Chicago Title denies a tender of defense with respect to new claims asserted in an amended complaint.  On July 23, 2010, Thompson Hine sent an internal email, indicating that it is "still engaged in collection efforts" on behalf of Chicago Title.

On August 6, 2010, Thompson Hine sent a letter to Chicago Title on behalf of LID.  The

6

letter again sets forth LID's position regarding the "complete defense rule."  In that letter,

Thompson Hine indicates that no one from Chicago Title has provided a legal analysis with

respect to the complete defense rule.  The letter further takes issue with Chicago Title's assertion

that it had not been provided with any additional information that would alter the coverage

determination.  In relevant part, the letter provides as follows:

> [Chicago Title] never provided us with a substantive response addressing the [complete defense rule].  Accordingly, we once again ask that you provide us with whatever authority Chicago Title believes supports its position that it is not obligated to defend all of the claims in the above-captioned case.
>
> In addition, [the attorney retained by Chicago Title to represent LID with respect to the "covered claim" in the Underlying Litigation] forwarded to me your July 21, 2010 letter, which was not sent directly to me, nor were we even provided a courtesy copy, even though it addresses issues which I (on behalf of my client, LID) have been disputing with Chicago Title for approximately a year now.... Her firm was not engaged to address coverage issues, so it is suspect why your communications on coverage issues were directed to her, rather than to me.
>
> Astonishingly, I understand that you also requested that she forward your July 21, 2010 letter to me.  There is no reason why you should not have communicated directly with me, as I have been in contact with Chicago Title for about a year regarding these coverage issues and you clearly had my contact information.
>
> Chicago Title's coverage determination appears to be based on a very limited view of certain evidence in the case, which has led to erroneous factual and legal conclusions.... In response, allow me to correct the following....
>
> ***
>
> These examples show a significant lack of understanding and a failure to conduct a serious investigation into the facts and law involved in the claims for which LID has demanded coverage.... Based on Ohio law... we renew our request that Chicago Title reverse its decision and reimburse LID for all of its reasonable attorneys' fees and costs incurred to defend LID against all of the claims in the litigation.
>
> It is undisputed that LID intends to rely on the correspondence from Thompson Hine to

show that Chicago Title engaged in bad faith in the handling of LID's coverage claims.

On August 19, 2010, Thompson Hine began the intake process of opening a matter on behalf of LID and against Chicago Title.  Thompson Hine completed the intake process on August 27, 2010.  That same day, Chicago Title sent a letter to Thompson Hine discussing specific case law and outlining Chicago Title's position with respect to the complete defense issue.         The letter indicated that it was sent in response to Thompson Hine's "request for reconsideration of the Company's August 24, 2009, July 15, 2010, and July 21, 2010 coverage determinations."

On August 30, 2010, the following email exchange took place among Thompson Hine attorneys:

> I am looking for an engagement letter, but so far no luck.  I found the original conflicts report we ran in August of 2007....  In 2009 Tom Zych approached me about obtaining a conflict waiver for a matter on behalf of KeyBank, and [Chicago Title] was willing to waive the conflict.  See attached waiver letter.  If there are other adverse matters, I am not aware of them.

> The problem with our ongoing case is that we are handling the garnishment on a judgment we obtained on behalf of [Chicago Title].  The amount of legal work is minimal but the work could go on for a long time.  Maybe we should look for a way to end our representation, if that's ethically permissible.

> [Chicago Title] may have some conflict policies for outside counsel, but if so I was not provided them when we opened the first case in 2007....
> Do you have any other suggestions?

> A: Do you want me to suggest to in house counsel that I close my file and have the garnishment monies sent directly to him?

> Reply: If there is nothing more to do on the case and we could then have a closed file, so there is no conflict in bringing the new case, that would be great.

The last time entry made by Thompson Hine for work performed on behalf of Chicago Title occurred on August 30, 2010.  The bill for work occurring through August 30, 2010 was sent on September 13, 2010.

8

On September 20, 2010, Thompson Hine sent a letter to Chicago Title referencing the Moore and Brown matters.   The letter stated, "this terminates our engagement on behalf of Chicago Title."

On January 12, 2011, Thompson Hine amended its contingent fee agreement with LID. Thereafter, on January 18, 2011, Thompson Hine filed the complaint in this matter on behalf of LID and against Chicago Title.

According to Chicago Title, it was not until June of 2011 that Chicago Title became aware of the dual representation.  Chicago Title claims that David Golub, who is in-house counsel responsible for this litigation, learned of Thompson Hine's representation on the Moore and Brown matters while reviewing Chicago Title's "Tymetrix" system.  Thompson Hine points out that within one week of this Court issuing an unfavorable ruling against Chicago Title, four different in-house attorneys sent Thompson Hine emails requesting updates or assistance on the Moore and Brown matters.  Chicago Title met with Thompson Hine on August 11, 2011, in order to seek Thompson Hine's voluntary withdrawal.  Thompson Hine refused, and thereafter, Chicago Title filed this motion seeking to disqualify Thompson Hine from continuing to represent LID on this matter.  LID opposes the motion.

**ANALYSIS**

Chicago Title argues that Thompson Hine must be disqualified from representing LID in this matter.  According to Chicago Title, Rule 1.7 of the Ohio Rules of Professional Conduct mandates the disqualification of Thompson Hine.[1]  The rule provides as follows:

---

[1]      Although Thompson Hine argues that it did not drop Chicago Title like a "hot potato," and claims that its representation on the Moore and Brown matters came to their natural conclusions, no party

9

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

      (1) the representation of one client will be directly adverse to another client; or

      (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

      (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

      (2) the representation is not prohibited by law;

      (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

      (4) each affected client gives informed consent, confirmed in writing.

According to Chicago Title, disqualification is required because Thompson Hine's representation of LID in the coverage dispute is directly adverse to Chicago Title's interest in the dispute, as both Chicago Title and LID were "current clients" of Thompson Hine at the time the conflict of interest arose. Chicago Title also argues that disqualification is required because Thompson Hine did not obtain a written waiver as required by Rule 1.7(b)(4).

---

claims that this conflict issue should be analyzed under Rule 1.9, *i.e.*, the rule pertaining to "former client" conflicts. As set forth below, the Court finds that at the time the parties were initially "directly adverse," both Chicago Title and LID were clients of the firm. In its opening brief, Chicago Title indicated that it expected LID to argue that the former client rule applied. It did not. Rather, LID analyzed this issue exclusively under Rule 1.7, which pertains to "concurrent client" conflicts. Accordingly, the Court will not address whether Rule 1.9 should apply.

On the other hand, LID argues that the interests of the parties were not "directly adverse."  In addition, LID argues claims that Chicago Title impliedly waived any conflict.  According to LID, even if a conflict of interest occurred, disqualification is not required.

The Court will address each issue in turn.

A.      "Adverse interests"

Chicago Title argues that the interests of LID and Chicago Title were adverse as of August 24, 2009, the date on which Chicago Title denied coverage for the defense costs in the Underlying Litigation.  LID argues that the interests were not "directly adverse" until after Chicago Title was no longer a client of Thompson Hine.  According to LID, the parties did not become directly adverse until August 27, 2010, the date on which Chicago Title provided a legal analysis supporting its rejection of the complete defense rule.  By this date, the Moore and Brown matters had concluded.

Upon review, the Court finds that the interests of LID and Chicago Title were "directly adverse" during the time Thompson Hine represented both parties.[2]  It is undisputed that Chicago Title denied coverage in August of 2009.  Even assuming *arguendo* that the interests of the parties were not adverse as of that denial letter, Chicago Title repeatedly stood by this initial coverage determination and Thompson Hine, on behalf of LID, repeatedly corresponded with Chicago Title in an effort to convince Chicago Title to provide coverage.  LID argues that the Court should look to the level of "antagonism" between the clients themselves.  In this case, LID

_____

[2]      At the outset, the Court notes that both parties submitted expert reports.  The Court will not consider the reports because, as noted by LID, this is a legal issue which can be resolved without resort to expert opinions.

11

prepared for litigation against Chicago Title as of December 15, 2009, at the latest.  On that date, LID entered into a contingency fee agreement with Thompson Hine to cap their attorneys' fees in the Underlying Litigation in exchange for a piece of the recovery LID may have against Chicago Title in the future.  Although LID avers that it was aware that Thompson Hine could not bring suit against Chicago Title due to the existence of the conflict, the contingency fee agreement evidences LID's belief that litigation was likely.  Even more troubling, the agreement puts Thompson Hine squarely at the divergent interests of its own two clients.  At the end of the day, this dispute centers on which entity–LID or Chicago Title–will pay Thomspon Hine's legal fees in defending the Underlying Litigation.  Unfortunately, both entities were Thompson Hine's clients.  Moreover, there can be no dispute that the interests were "directly adverse" as of the August 6, 2010 letter.  In that letter, Thompson Hine accuses Chicago Title of maintaining "a very limited view of certain evidence in the case," and further states that Chicago Title has shown a "significant lack of understanding and a failure to conduct a serious investigation into the facts and law involved in the claims for which LID has demanded coverage."  It simply cannot be argued that these accusations demonstrate anything other than "directly adverse" interests.  In fact, LID relies on these very letters in its attempt to establish a bad faith claim.  Thus, not only did LID believe that its coverage claim was wrongfully denied, it believed that Chicago Title acted tortiously in its dealing with LID.

    In sum, Chicago Title denied LID's claim on at least four separate occasions prior to August of 2010.[3]  At the same time, LID entered into a contingency fee agreement with

_____

    [3]        It appears that Chicago Title notified LID through its attorneys on August 24, 2009, October 9, 2009, July 15, 2010, and July 21, 2010.

Thompson Hine, which governed the payment of LID's fees for the Underlying Litigation. Pursuant to the agreement, Thompson Hine limited the fees LID paid for Thompson Hine's services in exchange for an interest in any recovery LID may have against Chicago Title.   The contingency fee agreement essentially transferred Thompson Hine's right to collect its fees from one existing client to another.  Then, in the August 6th letter, Thompson Hine essentially accused its own client mishandling LID's coverage claim, and LID intends to rely on those letters in connection with its bad faith claim in this case.  The Court finds that, on these facts, the interests of LID and Chicago Title were "directly adverse" during the time that both were represented by Thompson Hine.[4]

Moreover, no party claims that Thompson Hine obtained a written waiver of the conflict

---

[4]      Thompson Hine billed Chicago Title for work performed on August 30, 2010,  and email correspondence on that date indicates that "the problem with our ongoing case is that we are handling the garnishment on a judgment we obtained on behalf of [Chicago Title].  The amount of legal work is minimal but the work could go on for a long time.  Maybe we should look for a way to end our representation, if that's ethically permissible."  Obviously, as of this date, Thompson Hine believed it still represented Chicago Title.  Thus, even Thompson Hine's own attorneys acknowledge that as of August 30, 2010, the work was expected to "go on for a long time," and that terminating the relationship was the only way to avoid the "concurrent client" ethical problem.  Of course, Thompson Hine then suggested terminating the relationship without disclosing any of this information to Chicago Title, its own client.  Moreover, the ethical rules prohibited Thompson Hine from undertaking representation of LID once it became apparent that LID and Chicago Title were "directly adverse."  This Court concluded that the interests of the parties were "directly adverse" *before* Thompson Hine suggested terminating the relationship with Chicago Title.  Having already committed an ethical violation, Thompson Hine's attempt to argue that Chicago Title's uninformed agreement to end the relationship somehow absolves Thompson Hine of the wrongdoing is unavailing.

from Chicago Title.  Accordingly, the Court finds that Thompson Hine's concurrent representation of LID and Chicago Title during the time they had directly adverse interests constitutes a violation of Rule 1.7.

B.      Implied consent/waiver

LID argues that Chicago Title impliedly consented to the conflict by its delay in raising the instant motion.  According to LID, Chicago Title has known of the conflict since November of 2008.  Thompson Hine also informed Ed Horejs, Vice-President and Regional Counsel with Chicago Title, of the coverage claim and "raised the conflict of interest issue."  According to Thompson Hine, Horejs stated that "as a matter of practice, [Chicago Title] does not view the assertion of a claim for coverage as a conflict of interest."  LID additionally points out that Wegner, an in-house attorney for Chicago Title, was working on the Moore matter at the same time he communicated with Thompson Hine on the LID matter.  LID further notes that Chicago Title did not seek disqualification until eight months into this case, and not until it received an unfavorable ruling on summary judgment.  LID argues that it will lose the benefit of its favorable contingency fee agreement and be compelled to retain more expensive counsel.  In addition, LID argues that the motion to disqualify was made for strategic purposes, which is demonstrated by Chicago Title's attempt to "re-engage" Thompson Hine on the Brown and Moore matters shortly after receiving the Court's summary judgment ruling.

On the other hand, Chicago Title argues that Rule 1.7 conflicts cannot be "impliedly waived."  Rather, the rule expressly requires a *written* waiver.  Even if a concurrent conflict could be impliedly waived, Chicago Title argues that Thompson Hine never informed it of the extent of the conflict.  Specifically, Chicago Title provides Horejs's affidavit in which he avers

14

that he assisted Coyne in the presentment of the claim. After it was denied on August 24, 2009, Coyne never discussed with Horejs any potential conflict of interest. According to Horejs, he is responsible for making underwriting decisions on large commercial deals and has no involvement in whether policy claims are covered or denied. Nor does Horejs have any responsibility for waiving conflicts. Moreover, Chicago Title points out that Coyne's last time entry involving Horejs occurred on July 23, 2009. With regard to Wegner, Chicago Title acknowledges that his work on the Moore and LID matters briefly overlapped. During the overlapping time period, however, Wegner sent a total of only four emails regarding Moore. Moreover, he avers that he never associated Thompson Hine's representation of Chicago Title in Dayton with Thompson Hine's representation of LID in Cleveland. Regardless, at no time did any Thompson Hine attorney raise the conflict of interest issue with Wegner. According to Chicago Title, the responsibility to address waiver issues lies with the law firm, not the client. In addition, Chicago Title points out that nobody alluded to the contingency fee agreement until responding to a subpoena issued in this case on September 16, 2011. Thus, Chicago Title could not have consented to any conflict because it was not aware of all of the facts.

Assuming *arguendo* that a concurrent conflict could be impliedly waived, the Court finds that LID fails to establish an implied waiver. As LID notes[5], a waiver should be found where:

> (1) there is substantial proof that the movant's delay has resulted in serious prejudice to the opposing party; or

> (2) where litigation has proceeded to the point where disqualification would create

---

[5]     The law cited by LID relates to when a *former* client can impliedly consent to the conflict. As Chicago Title points out, however, the parties' interests were directly adverse at the time both were represented by Thompson Hine.

substantial hardship to the opposing party; or

(3) where it is clear that the moving party knowingly delayed the filing of the motion in order to cause such hardship or prejudice.

Upon review, the Court finds that none of the foregoing factors are present in this case. As an initial matter, while Horejs may have indicated that he does not view the presentment of a title coverage demand as a conflict of interest, there is no indication that Coyne ever informed Horejs of any conflict once the parties interests became directly adverse.  LID argues that the parties' interests were not directly adverse until the August 27, 2010 letter, at the earliest.  Coyne does not claim that he had any contact with Horejs during the entire preceding year.  Thus, the fact that Chicago Title does not view an initial coverage demand to be a "directly adverse interest," does not translate into a wholesale wavier of all "directly adverse interest" conflicts. Moreover, other than possessing a basic knowledge that Thomspon Hine was performing work on both the  Moore and LID matters, there is no suggestion that anyone at Thompson Hine ever raised the conflict issue with Wegner or that Wegner understood the depth of the conflict.  The Court agrees with Chicago Title that it is the responsibility of the attorney to inform the clients of concurrent conflicts of interest.  Moreover, LID fails to point to any "serious prejudice" it will suffer.  As noted above, Thompson Hine informed LID of the "conflict of interest issue" long ago.  At best, LID points out that it might lose its "favorable fee" agreement.  There is no evidence, however, supporting this contention.  LID may very well be able to secure a contingency fee agreement in this case, especially given the favorable ruling it already obtained on summary judgment.  With regard to "substantial hardship," the Court notes that this case is

16

still in the discovery stage, summary judgment motions are not due for over six months[6], and no

trial date has been set.  For these reasons, the Court finds that LID fails to establish that an

implied waiver should be enforced against Chicago Title.

      C.      Disqualification

      Chicago Title argues that disqualification is mandatory under *Carnegie Cos., Inc. v.*

*Summit Properties, Inc.*, 918 N.E.2d 1052 (Ohio Ct. App. 2009).  LID, on the other hand, argues

that not all ethical violations require disqualification.  According to LID, disqualification is not

warranted on the facts of this case.

      Upon review, the Court finds that disqualification is not mandatory.  In *Carnegie*, the

court found as follows:

> This court holds that a violation of [Rule 1.7] requires disqualification of the offending
> lawyer.  The language of the rule prohibiting concurrent adverse representation is
> mandatory.  A lawyer shall not accept or continue the representation of a client if a
> conflict of interest would be created *** unless all [three prongs of the exception] apply.
> Absent such a showing by the lawyer, the trial court must grant a motion for
> disqualification.

*Id*. at 1069.

      *Carnegie* noted that Ohio recently adopted Rule 1.7.  The former rule, DR 5-105

provided:

> A.  A lawyer shall decline proffered employment if the exercise of his independent
> professional judgment in behalf of a client will be or is likely to be adversely affected by
> the acceptance of the proffered employment, except to the extent permitted under DR
> 5.105(C).
>
> B.  A lawyer shall not continue multiple employment if the exercise of his independent
> professional judgment in behalf of a client will be or is likely to be adversely affected by

---

[6]    The parties also filed summary judgment motions early in this case
in order to resolve one issue.

his representation of another client, except to the extent permitted under DR 5.105(C).

C.  In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation....

The *Carnegie* court noted that the former rule contained a clause preventing representation upon a showing that the attorney's independent professional judgment is likely to be compromised by the representation.  Even if such a showing could be made, the conflict could be remedied by demonstrating that it is "obvious" that the attorney could adequately represent the interests of each and if a written waiver was obtained.  The *Carnegie* court noted that the new rule does not limit concurrent conflicts to those situations in which the attorney's judgment is likely to be compromised.   Rather, all concurrent conflicts now require written waivers before representation can be accepted or continued.  The court relied on the mandatory nature of the language in Rule 1.7 in determining that disqualification was required.  *See*, R. 1.7 ("an attorney *shall not* represent a client if the representation involves a concurrent conflict of interest" unless a written waiver is obtained).

On the other hand, LID relies on *Cliff Sales Co. v. American Steamship Co.*, 2007 WL 2907323 (N.D. Ohio Oct. 4, 2007), in support of its position that disqualification is not required. In that case, the court expressly found a violation of Ohio's new rule, *i.e.*, Rule 1.7.  The court did not analyze the language and, instead, simply noted that "while some courts have adopted a *per se* rule requiring disqualification of counsel based on concurrent representation, this Court is persuaded that the better approach is to examine the factual situation to determine if

18

disqualification is necessary." Id. at *5.[7]

This Court finds that nothing on the face of Rule 1.7 requires that a court *disqualify* an attorney for a violation of that rule.  Although the Court agrees with the *Carnegie* court that the language contained in Rule 1.7 is mandatory in nature, the Court finds that the language applies to determining whether a violation of the concurrent client rule occurred.  It does not provide for any particular mandatory consequence once a violation is established.  Accordingly, the Court agrees with LID that the disqualification is not *per se* required.

That being said, it would seem to be the unlikely case in which a court would permit continued representation in the face of a violation of Rule 1.7, as by its very nature denying disqualification would promote a continuing ethical violation.  Upon review, the Court finds that, on the facts of this case, disqualification is warranted.  As an initial matter, the nature of the conflict is greatly disturbing to the Court.  In the typical conflict of interest case, the attorney has no stake in the conflict, other than perhaps obtaining additional business from a "lucrative" client.  In this case, however, Thompson Hine appears to have renegotiated a favorable fee agreement with LID so that the fees LID incurred in the Underlying Litigation could be paid by Chicago Title, who was another firm client at the time the fee agreement was signed.  This is only exacerbated by the fact that LID's principal member is the brother of the head of the real

---

[7]    The parties discuss this Court's decision in *Pioneer-Standard Electronics, Inc. v. Cap Gemini America, Inc*., 1:01 CV 2185. *Cliff Hills* relied on *Pioneer* in determining that no *per se* disqualification rule exists.  As *Carnegie* points out, however, *Cliff Hills'* reliance on *Pioneer* is misplaced.  In *Pioneer*, this Court determined that no ethical violation occurred in the first place. Thus, the Court never reached whether disqualification is mandatory or discretionary.

19

estate department at Thompson Hine.

In addition, as noted above, LID intends to rely on correspondence written by Thompson Hine and directed against Chicago Title (at the time Chicago Title was a firm client) in order to establish bad faith.  As stated by Chicago Title, it is likely that Thompson Hine attorneys may be called to testify in this case.  Although that issue is not currently pending before the Court, the Court finds that it weighs in favor of disqualification.  Moreover, as Chicago Title points out, discovery is not yet over and dispositive motions are not due for seven months.  No trial date has been set.  Thus, the Court finds that LID will not suffer undue prejudice by the disqualification.  In addition, as expressly stated by Thompson Hine, LID knew of the conflict of interest throughout the concurrent representation period and the potential for disqualification should not be surprising.

The Court recognizes the importance of allowing litigants access to the counsel of their choosing and further recognizes that motions to disqualify are "disfavored."  However, as noted in *Carnegie*,

> This court is aware of the delicate balance to be struck between the right to proceed with counsel of one's choice and the need to ensure that attorneys act ethically.  A party does not, however, have an absolute right to be represented by a particular lawyer or law firm.  In concurrent-representation situations, the importance of maintaining the public confidence in the propriety of the conduct of those associated with the administration of justice outweighs a party's interest in choosing its own lawyers.

*Carnegie*, 918 N.E.2d at 1068.

In this case, the Court finds that Thompson Hine clearly violated its duty of undivided loyalty by taking adverse action against its client, Chicago Title, in favor of another client, LID.  Given the unique nature of this case in that it ultimately involves determining which client will pay Thompson Hine's fees for the Underlying Litigation, together with the fact that Thompson

20

Hine took actions against Chicago Title during its representation which will be used against Chicago Title in this case, the Court finds that the interests in maintaining the public confidence and assuring the propriety of attorney conduct, outweigh LID's interest in choosing its own attorney.

**CONCLUSION**

For the foregoing reasons, Defendants Chicago Title Company's and Fidelity National Title Group, Inc.'s Motion to Disqualify Thompson Hine as Counsel for Plaintiff (Doc. 39) is GRANTED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 12/1/11

21